Next case for the morning is In Re Effexor XR Antitrust Litigation and first we call Mr. Refson. Yes, may it please the court, my name is Barry Refson, I represent the retailer plaintiffs CVS and Rite-Aid and I'd like to begin by saying that this case is even more clearly aligned with the facts of the King drug case, than the prior case that we heard. In fact, I suspect that you would argue that it is not only more closely aligned, but that it may be factually stronger. I would. Did you not argue that in your brief? Yes, I would say that this is even stronger than the lamictal facts. We have a reverse payment consisting of a no-authorized generic agreement, which is identical to the lamictal facts. In addition to that, we have facts that suggest that the parties in settling the Effexor case extended the period of exclusivity by five months, above the six-month period of exclusivity. And we also allege that they included rights to sell Effexor IR, which is an immediate release version of Effexor, that was about a $100 million a year product, that Effexor would have had no right to sell had they not settled this. Let's get back into the analysis that was introduced by question in the prior argument, which I assume you were present in this courtroom, Judge Ambrose, and that is the large and unexplained. Where do we begin our analysis in determining whether a reverse settlement payment is large? We have no case law essentially characterized by that. And I think that was purposeful on the part of activists. I don't think the court came up with an exact definition of what large means. It did not, so what do we make of that? And where do we go from there? Well, I think the place to begin, at least in activists, is whether the payment is bigger than litigation expenses. That's one. Should we ask, first of all, are we talking about absolute value or are we talking about relative value? I think you're talking about value that's sufficient to induce the delay by the general. So I think it's a standard that must depend on the facts and circumstances of the case. I think it's probably a standard that is mostly for the jury, as long as sufficient facts can be identified in the pleading to suggest that there was some inducement and that facts will be discovered to show that the payment was large enough to induce delay. And then at summary judgment, you look at all the facts that are discovered, and most of these brand-name companies, at least in my experience in discovery in these kinds of cases, actually do have analyses of what the effects of the settlement are going to be, and a lot of that's going to come out in discovery. But it has to be a standard on which the jury has an opportunity to determine whether the facts that the plaintiffs present are sufficient to show that that payment was the reason for the delay that you see in the settlement agreement that delays generic entry. But I don't think it's a standard that the court should go about trying to define precisely, because I think it was very advertent by the Supreme Court to leave that open and not identify a standard that needs to be identified with certainty. Because the issue is, what's the purpose for that payment? Is the purpose to delay generic entry? And if you can conclude that the purpose is to either avoid the risk of the patent case or delay generic entry, that's sufficient to create the cause of action. So how have you alleged that the settlement agreement is unexplainable? Well, I think that mostly that issue, that unexplainability issue, is an issue for discovery. We've alleged that there was a no AG agreement and the other elements of the payment that was for the purpose of delaying entry. Do you include any allegations in the complaint about the settlement agreement's royalty provision? I don't think you did. We did not, but we also did not have the unredacted version of the agreement when we started this case. Which you did later on, didn't you? The motions to dismiss were briefed and argued over the course of I think about two years, a year and a half to two years, and the agreement was produced to us. The unredacted agreement was produced to the plaintiffs in the middle of that process, and some of the plaintiffs put a little bit more detail in their complaints at that point and some of them did not. But that actually shows the danger of starting to introduce facts like that in the middle and use those kinds of facts in the context of briefing a motion to dismiss. Because when you look at the agreement, and the unredacted agreement is now in our record on appeal here, and if you read it, Your Honor, you'll see it's a very complex agreement that really hides the effects of those royalties. The briefs explain the effects of those royalties, but it's not clear when you even read it unredacted exactly what happened. But it has a 15% royalty that Teva was supposed to pay during the period of exclusivity when it was also getting the benefit of the no AG agreement, and then it would go up to 50% for the following six months, and then it would possibly increase to 65%. Now, we show some algebra in our reply brief, the retailer's reply brief in a footnote, suggesting that the effect of those escalating royalty rates in connection with the no authorized generic agreement could conceivably be almost identical to what happened in Lamictal where there was no royalty. Because in Lamictal, there was no royalty at all. It was just a no AG agreement. And Lamictal got the benefit of no competition in that first period. Here, Teva would have no competition in that first period, but had it paid 15% off, so it was possibly an offset to the value of the no AG agreement. But it got less competition in the following period when it paid a 50% royalty. If you carry out a possible effect of those royalties in connection, the additional benefit in that second period with the 50% royalty possibly completely offsets that 15% royalty in the first period. My point is we don't know exactly what the effects of those royalties were or were intended to be. That's something for discovery, and it should not be addressed on a motion to dismiss. That needs a lot more work than anything that we have now. Mr. Ruffeson, let me ask you a question here. In King Drug, we articulate a rule of reason framework. What role should that rule of reason framework play at the complaint stage, if any? I think that's the legal standard governing the claims. I don't think it's for the plaintiffs to prove that they can satisfy the rule of reason at the complaint stage. I think that you have to look at the facts that are pled and determine whether it appears as though the plaintiffs will plausibly be able to make out a claim under that rule of reason. But it's not to plead evidence or actually to identify the exact value of the payment. There have been some issues about what the standard was that the defendants are asking for and the district judge used in its opinion. The district court clearly wasn't a plausibility standard. The district court said that one of the problems with the complaints was that they don't rely on a business practitioner in the pharmaceutical industry. I mean, that sounds like a summary judgment standard talking about experts that might be produced. Heather's brief makes the following statement at page four of its brief about what the standard is on a motion to dismiss. They say that the appellants must provide sufficient factual allegations to allow the district court to conclude that the settlement agreement contained a reverse payment from the patent holder to the patent challenger that was both large and unexplained within the meaning of FTC versus activist. They want us to plead to prove the entire case and have the district judge reach conclusions before we're even allowed to conduct discovery. That can't be the standard. I mean, that's proving the entire case under the rule of reason before we even get the benefit of any discovery in the case. I'd like to say briefly that no authorized generic agreements like the one in this case are even worse than cash payments because they're actually two market allocation agreements linked together. There's an agreement for the generic not to compete with the brand and then there's an agreement by the brand not to compete during the generic period, exclusivity period, and that those two linked agreements together are worse than cash payments. And the retailers make the argument in our brief that that theory should be subjected to even greater scrutiny than plain cash reverse payments. And we make that argument in our brief and suggest that that might even be worthy of a per se standard, whereas the King drug case is a rule of reason. I see my time is over. Thank you. You have reserved time. I have reserved two minutes. And the one thing I did not address was the North Pennington argument. I don't know if you can do that if you think appropriate on the model. I will. Thank you, Your Honor. We'll cue rather closely to the clock for this argument because like Mr. Miller, Judge Ambrose is doing double duty this morning and we have an 11 o'clock break. Mr. Swenson. Good morning, Your Honors. David Sorensen for the Direct Purchase of Class Plaintiffs. I want to start with the issue of the large that's come up several times. The only quantitative benchmark the Supreme Court suggested was the brand's safe litigation cost, that is the payment should be plausibly, at the complaint stage, larger than the brand's safe litigation cost. A couple things there. One, why is that even mentioned in the Supreme Court? Because as the briefing to the Supreme Court, as the economic literature makes clear, as district court opinions such as the NISVAN case from this circuit makes clear, a brand is not going to pay its opponent, the generic competitor, more than it would pay its own patent lawyers unless it's getting more protection from competition than it thinks it could get by enforcing its patent. Otherwise, you just pay your patent lawyers and you pursue the case. But there's more in the way of transaction costs than merely paying your lawyers, right? There are some additional transaction costs, but the only costs the Supreme Court mentioned were litigation costs.  But it wouldn't be practical to attempt to value the cost of litigation by focusing solely on lawyers' fees, right? I think that the Supreme Court... Even if it hasn't been stated explicitly, that just doesn't seem to me to be an economically reasonable way to evaluate such an offset. Well, Your Honor, the Supreme Court... The defendants in that case, in the activist case, exactly the point you're making. It's in those briefs, and the Supreme Court only said litigation costs. But putting that aside, in terms of the plausibility of our complaint, we've alleged a large and unjustified payment. In terms of unjustified, a no AG... I agree with my colleague. A no AG and Hub and Camp, or we in Hub and Camp agree with this, is worse than a cash payment, because there is nothing the generic is giving back other than delay. There are no services. There are no goods. In activist, the generic supposedly was giving back promotion services, and the FTC alleged that those, whatever they were, the generic was being way overpaid for. And so the explanation that the defendants were trying to offer, would offer, is no, the money to the generic is not for delay, it's for these other goods and services. In a no AG deal, as we have here, there is nothing. The generic is not giving the brand anything. There's no goods, there's no services, no promotion, other than delay. And that's not... delay is an explanation, but it's an unlawful explanation. That explains what's going on, but that's exactly what's unlawful. And explanation is a defense. I want to be clear. I'm not saying that above litigation costs is a quantitative minimum. There is no quantitative minimum. All I was trying to say is that's the only benchmark the Supreme Court mentioned. But explaining a payment... Mr. Sorensen, didn't Congress sort of anticipate in Hatch-Waxman that those kinds of settlements would occur in the way they structured the paragraph 4 certification in the time periods allowed? Which kind are you talking about? Yes, I mean... Now, obviously that's before the Supreme Court spoke and actuated us, but I think an argument can be made that what's being done here is not inconsistent with what Congress anticipated. It's manipulation and distortion of what Congress did. There is nothing in Hatch-Waxman that sanctions this. The sponsors of Hatch-Waxman, Hatch and Waxman, both have spoken extensively condemning reverse payment agreements pre-activists as this started to develop. This is your companies manipulating and taking advantage of the structure of Hatch-Waxman. This was designed to speed up generic competition, Your Honor, not allow brands to pay generics to slow it down. My time is up. Thank you very much, Mr. Sorensen. Now, let me have you introduce yourself so I don't butcher your name. I would say Chechi, but... That's not bad. I try to pronounce the Italian names with the classic C-H. The C-C-H in Italian is pronounced Cheki. It's a difficult one. No, it's not. Thank you, Your Honor. Good morning, Chief Judge, Judge Ambrose, and Judge Fischer. I rise to represent the consumers in this case, the end payers. I would agree with my colleagues that this market allocation agreement, as we've alleged, is a particularly pernicious form. We're a little different, and that's the only point I would make in my initial presentation. We never even amended our complaint. What happened is the district court addressed the direct purchaser's complaint, dismissed the direct purchaser's amended post-activist amended complaint. We never even amended our complaint. Our complaint is pre-activist, and what happened is after the dismissal of the direct's complaint, we said, well, look, we want to move this forward. We wanted a 54B to get before Your Honor on the issues because it just didn't make any sense at that point. We were similarly situated, although we never even got a chance to amend. I would then say if we go back, which obviously we submit we should, if our pleading is not sufficient under whatever standard is articulated here, we should get an opportunity to amend. Although, as we argue in our brief, we think even pre-activist, we've alleged clearly plausibility, feasibility as to the payments here, market allocation, so to speak. So I just wanted to point out that distinction and reserve my time for rebuttal. Two minutes? How much time did you reserve for rebuttal? Three minutes. I'm not committing to using all of it, but I did reserve three minutes. Ms. Johnson, did you reserve? Yes, Your Honor. Okay, two minutes. Thank you. All right. Mr. Milne. Even Mr. Lefkowitz may be getting a certain sense of deja vu here. Exactly. On behalf of different clients. If it pleases the Court, Robert Milne on behalf of Wyeth. I'd like to obviously address the patent settlement issues and then turn to the Norm Pennington. You called this an exclusive generic license, correct? It was called. If that was the title. Did the patent holder hold the right to the sole generic during the 180-day period? I'm sorry, can you repeat that? Did Wyeth hold any right to be the sole generic during the 180-day period? Wyeth gave license to Teva the right to be the sole generic during the 180-day exclusivity period. So you're saying that Wyeth was the owner of the exclusive generic patent? Wyeth was the owner of the patents in question, gave a license to Teva to be exclusive for the six-month period after the agreed upon entry date, which was multiple years before the expiration of the relevant patent. And I don't necessarily, Your Honor, want to get tied up in whether this truly is an exclusive or something else. I'd like to focus on a more fundamental issue, which we talk about in the papers here, which I think very clearly distinguishes two things, really, that distinguish this situation from the situation present in the L'Amicto. First, starting just, and I use the term king drug, shorthand it. In the L'Amicto decision, this Court addressed a particular no AG provision. And in its decision, I don't read this Court's decision in king drug to be saying that any and all licenses that may contain a no AG provision are unlawful or warrant for a rule of reason scrutiny. What this Court said at 403 is that a concern is raised when a no AG provision represents a large transfer of value from the patent holder to the alleged infringer. And then a couple pages later at 405, this Court said that scrutiny is warranted with those kinds of licenses where, quote, the source of the benefit to the settling generic is something costly to the patent holder. You have to give up considerable value. That was another quote that the Court used in 405. And that's consistent, this Court was picking up on language from activists itself, where the Supreme Court, in delineating between... I mean, after the Markman hearing, if you were to go back to the status quo, you were getting considerable value, were you not? And then you gave up something for that. Well, I'm sorry. Okay, what happened at the Markman hearing? In the underlying, there were multiple Markman hearings across all of the litigations, but in the settled litigation, there was a Markman result. It wasn't more narrow than you had anticipated? It was more narrow than we anticipated. There was still much room to go in the litigation, but the parties did settle at that point. There were seven more Markman hearings in subsequent litigations, and Wyeth prevailed in six out of the seven of those Markman hearings, even though the Markman hearing in the original litigation was cited in those cases. This was the extended release one thing? Yes, yes. But, Your Honor, to step back here, it makes sense that this Court would be focusing as a threshold issue, as did the Supreme Court, on the question of whether there is some cost to the patent holder in the license in question, because that's the whole reason for the Supreme Court's concern over payments, is that the paying of going out of pocket by the patent holder may betray concern about the strength of the underlying patent position that the company has. And where the brand, where the patent holder does not go out of pocket, is not sacrificing significant value, then there's no basis for that inference. There's two key facts in the Lamictal decision that I think are critical here, and they were talked about in my adversary's arguments. Number one, no royalties. The license was given in return for nothing in return coming to the patent holder in Lamictal. Also in Lamictal, the plaintiffs were able to, and this is all public information, able to plead that the brand in that case, the patent holder in that case, had a significant track record of introducing authorized generics during the exclusivity period of generic firms entering the marketplace. And that's important because it is not a given that a branded company will introduce an authorized generic. It's a business decision that has to be made. You have a branded product that will continue to be sold. If you put a second generic in the marketplace in the form of your own licensed generic, it's going to cannibalize your higher margin brand sales. So it's a business decision in each case. Mr. Milne, I don't want to interrupt the sequence of your argument. Is it your intention to address the Moore-Pennington argument? I would like to address the Moore-Pennington if I could. Could we hear from you on that? Because I have struggled, frankly, with understanding your position of how we can break this consent order within the Moore-Pennington, given even what the Supreme Court has said about the nature of consent orders and the basis of an agreement being what drives the consent. Okay. I'm happy to do that. Would you mind if I just finish 30 seconds? Just to draw the point home here on the distinction with Omicdal, and that is here in our case we don't have either of those things that were present in the Omicdal case. We have royalties, substantial ones, and the plaintiffs don't make any allegation that would say that the royalties being collected by Wyeth were somehow not sufficient to make it whole versus what it would have done had it introduced its own authorized generics. They're utterly silent on that issue. And there's no allegation that Wyeth had any history of introducing authorized generics. And so I think those things are very critical distinctions and pleading failures that allow one to draw a key distinction here between the situation in King Drug and the situation we have here. Where there is a license that has royalties coming back, that is a quintessential, legitimate, traditional type of settlement. And we have a settlement where the entry date was multiple years before the expiration of the relevant patents. So to leave time for walk of process, my colleague Mr. Lefkowitz will be addressing reverse payment issues. I'll turn to Norm Pennington. And, Your Honor, I think the issues on Norm Pennington really derive from a unique situation that was present. We had a consent decree that had been negotiated for, insisted upon by the FTC, that made it so that no hatch racks from patent settlement could become effective without government petitioning. I just don't see how you get around the holding and the thrust of local number three versus a coupon, where the court says, indeed, it is the party's agreement that serves as the source of the coupon, and there is no judgment of the agreement. Your Honor, I think there could not be an agreement without government action here. That is the key. So is what you're saying that the consequences, every time the FTC declines to intervene in a patent settlement, no one could ever bring an effortless claim? I'm not saying, I'm not being that, and we're not creating a slippery slope here, Your Honor. I mean, we hear the plaintiffs talking about the NMA, the Medicaid Modernization Act, and the procedure. So you're writing this opinion. What test would you put it down? Well, I would say where you have the kind of unique situation that we have here, where you had a bargain for by the Federal Trade Commission consent order that put it on the FTC to make objections. It wished to come in and voice to the court if it had concerns. And so what that set up was, unlike the NMA, it set up a situation where Wyeth had to go into the FTC, present the materials required under the consent order, petition the FTC to take no action, make its arguments as to why it believed that the settlement was lawful. Wyeth also had to go to the patent court and solicit from the patent court the permission to have the FTC be able to do so. But here the FTC tells Judge Marti that they reserve the right to take further action against settlement in the future, but not that it had no antitrust concerns. They did put in what I would consider their boilerplate kind of reservation of rights. And that's what I'm concerned about. If they come in and they do their boilerplate, you're saying that that puts you within North Bennington in your view? I'm saying, Your Honor, in a situation where I'm not saying whenever they do that, because they do that in plenty of situations beyond what we're talking about here, which is the narrow situation where you have a consent order that prevents an agreement from becoming, I mean, this agreement would not, could not have been entered, could not have become effective without those two levels of government petitioning. It is a fact. This isn't like so ordering a settlement agreement at the end of a patent case with no consideration at all of antitrust issues. This was a relatively unique situation, and it involved these two levels of government petitioning. It is a fact that cannot be denied that this agreement would not have become effective but for government action. And as a basic matter of fairness, had the FTC voiced any kind of concern, I think we wouldn't be here today because I'm sure the parties would have either continued to litigate or adjusted the terms of the settlement. Thank you, Mr. Newman. Thank you, Your Honor. Thank you very much, Your Honors. I think I'd like to just start with a couple of words on the Newark-Pennington issue, because I want to answer Judge Ambrose's question of what would the test be if you were writing this opinion in our favor here. And I think the focus on the FTC is actually not the proper focus. Actually, I'm asking you, what would the test be in your view? In my view. And then we can figure out how it goes after that. I think the test is you have to look at whether there is, A, significant judicial review and approval, whether, B, without that judicial approval, the settlement can't happen and the conduct that is alleged to be anti-competitive cannot take place. And the court, if it's the court doing the review, if it's the court as opposed to a legislator, then it has to be the court taking into account the very anti-competitive concerns here. And that's what happened here. This is not a mere rubber stamp. This is not just so ordering a settlement. Judge Martini scrutinized the actual terms of the settlement. The fact that he requested review from the FTC is just indicative of the fact that he was focused on the anti-competitive issues. He then adopted and enacted the terms of the settlement and specifically enjoined Teva from selling the generic version. And there is a case that's directly on point that I just want to point out to the court. It's an opinion from the Central District of California in a patent case, Net Immune v. Genentech, 2003, Westlaw, 25550611. And the relevant language in the decision was, this is not a case of an anti-competitive private agreement receiving immunity because it passed through government hands in some ministerial way. Here, the very anti-competitiveness of the agreement depended on the government exercising its independent power to decide priority and issue the new patent. But didn't Judge Martini do anything other than enter into a consent decree to approve your settlement? He evaluated this. Did he have any control or input into the actual substantive terms of the agreement? He didn't have to approve it. And I think when he went to the FTC, it demonstrated that he was focused on the question of whether there was a competition problem with his going ahead and entering it. And I think when he did that – Did the court adopt the consent decree that you submitted to him? I believe the court did ultimately adopt that agreement. Without change? Without change. I don't think there was a change. And then it entered into an injunction. It imposed an injunction, and that's the court action, which I don't think, again, was merely, as they say, a rubber stamp because of what Judge Martini did before he made that decision. I'll leave that aside, and if I may move on to the – And I think, Your Honor, Judge Smith, I'd like to start with the very first question you asked counsel, I think Mr. Refson, about whether or not they addressed the royalties. Because at the hearing where the plaintiffs, after they had gotten the royalties and all of the information spelling out what the royalty payments were, they then said, We'll plead and we will prove that the royalty payments amounted to a kickback for what they say are massive windfall payments. That's at JA 1647.25 to 1658.3. I think the royalty payments are critical here because, again, the question after L'Amical is no longer whether or not if you enter into a no AG pledge you are automatically immune in this circuit from antitrust scrutiny because it's an exercise of the patent licensing authority. This court made that clear, and it said, A no AG pledge can, in fact, constitute a reverse payment. The question is, have they alleged here that the no AG pledge was, in fact, doing any work here? There's no question that there is a no AG commitment. But there's also a royalty stream. And so there's a rational basis now for a company to choose not to go into the generic market, particularly a company like Wyeth, where there's no allegation that they had ever before this moment in time launched an AG because, of course, to launch an AG cannibalizes your own sales. And it might be the case that some companies like GSK in the L'Amical case where it was alleged that they had done it over ten times. So in that situation, it might be plausible to say, well, they promised not to do it. And, of course, they weren't given anything in exchange. So it might have been reasonable to assume that that was sufficient, although I'll point out that this court never addressed the actual pleading standard for pleading a reverse payment in L'Amical because it wasn't raised by any of the parties. We were talking about the other question. But in this case, where there's no allegation that Wyeth had ever launched an AG, and, in fact, now there's a royalty stream, so Wyeth has traded this promise not to launch an AG in exchange for getting payments every time the generic sales, that might be a perfectly rational choice. Now, it may or may not have value that is more than minimal value. But without addressing, as they said when they said we will plead and we will prove, without even acknowledging anywhere in these complaints, hundreds of pages of complaints, and if you do a word search for the word royalty, it doesn't appear. How can you be credibly pleading a large and unexplained payment? There's no question there is a commitment not to compete as an AG. I think the generic might have asked for that as a form of insurance. But not all insurance is valued the same. If an 18-year-old buys a term life insurance policy, there isn't a lot of value because it's a very small premium. It's different than if an 80-year-old tries to buy term life insurance. The question here is, was the no AG pledge actually doing anything anti-competitive here, or is it reasonably explained as a market transaction? Again, to take my hypothetical from the client... I thought your argument was that this wasn't so much a no AG agreement, but rather that it was a grant of an exclusive license. Well, the argument that certainly I'm paid in the remittal case is that no AGs are all the time just grants of exclusive licenses. The question in this case, now that this court has said that a no AG commitment can in fact be pledged as a large and unexplained payment, the question is, is the no AG pledge that they are alleging took place here in the Avexa case, is it a large and an unexplained payment? I think it is certainly explainable by virtue of the fact that Wyeth was getting an income stream. That was pure profit for Wyeth. Whatever Tebo was going to sell, they were getting a percentage. If they had gone into the market with an AG, they would have made less money because, or they may have made less money, we don't know, because the price would have fallen even more, so there would have been lower prices, they would have only captured part of the generic money market, and they would have only had revenues for which they then would get a percentage for profit. Here, they stayed out of the market in exchange for a reasonable transaction. Mr. Lefkowitz, in their reply brief, the plaintiff's reply brief at pages 21 and 22, they say that even taking your belatedly disclosed royalties into account and deducting that from the value of the no AG agreement, the amount would still be in hundreds of millions of dollars. How do you counteract that answer? I think, Your Honor, that that is completely a conclusory argument. It's not borne out by any allegation in the complaint, and without addressing the royalty, there's no way to know whether there was any value at all in the promise not to launch it. Do you acknowledge that the royalty had not been disclosed at the time the complaint was filed? No. In fact, in their brief, the direct purchasers state that they learned of the royalty terms on September 9, 2013, when they first received an unredacted copy of the agreement. That's in their brief at 3060-37. Evidence of the existence of the royalties was well known, long in advance, but they then, on September 10, the very next day, when they were at a hearing on a motion to amend the complaint, the district court asked the direct purchasers how the royalty payments that they had acknowledged they had factored into the analysis. That's at JA 1656.5-6. And at that moment, that's where the DPP counsel responded, we'll plead and we will prove that the royalty payments amounted to a kickback for a massive windfall payment. And then on October 23, six weeks after that statement, six weeks and a day after they had all of the terms of the royalties, the court granted leave to the DPPs to file an amended complaint, and they did so without any reference to the royalties. And then on January 2, 2015, at a hearing on the Rule 54B motion, the DPP said, we are standing on our complaint, and instead we want to go up on appeal. And none of the other... It sounds to me like the whole value of the royalty payment to be offset against the reverse payment is really a question for a summary judgment stage, not a motion to dismiss. Your Honor, again, I understand that Twombly and Iqbal standards are a little bit in the eye of the beholder, because the court articulated a very strong policy, particularly with respect to antitrust cases and the concern... Twombly was a... It wasn't antitrust. I mean, I would close, Your Honor, because I see my time is up, by simply saying this. I'm sure people have waved Twombly and Iqbal in front of this Court hundreds, if not thousands of times. I myself have stood in this Court... In fact, Your Honor, to the extent that we've frequently heard the good reference to Iqbal. But I would say... And I thank counsel, all of you, for not invoking that. In lieu of concluding on Twombly, I'll simply say, Your Honor, that this actually... I know. This actually is a case that I think cries out for an examination of what the Court was trying to accomplish there. Because, again, this royalty payment could, if they... And they had all the information they could have done in their complaint, the allegation as to what the value might have been. But it is equally possible. Indeed, I say more plausible than anything else, that this royalty payment was a market treatment for which Pfizer, which had a history of never filing AGs, never doing AGs, said, now we're getting paid for it. So it isn't, like Lamictal, a naked no AG case. Thank you. Thank you very much, Mr. Levin. Mr. Hudson, you have rebuttal. Thank you, Your Honor. Just on that last point about the royalties, I mean, the royalties are, at most, as Judge Fischer pointed out, an offset from the value of the no AG agreement. I also would invite the Court to look at the royalty provisions in the unredacted version of the agreement that was eventually produced. It's at third page, JA 3210. And the provisions are really inscrutable. We know what the defendants say, how they operated from the briefing in this case. But they go on for two pages. They're very difficult to really tell how they apply. And it really is a question for discovery to determine how they work and what the value is that should be offset from the value of the no AG that this Court clearly recognized in the Lamictal opinion. I want to briefly address the North Pennington issues. And I want to point out that the facts for North Pennington are nowhere that the defendants rely on come nowhere out of any of the complaints in this case. There are no facts pled about the 2002 Shearing Consent Decree. The defendants put all of those facts into the record in their briefing. The standard that Mr. Lefkowitz articulated, which was whether there was significant review and approval, whether the agreement could happen without judicial review, and whether the conduct could take place without judicial review. There are no facts in the complaints to evaluate that standard that he articulated. And the FTC has put in extensive amicus briefs in this case that articulate its view that North Pennington Which I assume you endorse. We definitely endorse them. The MedImmune case that Mr. Lefkowitz identified was a summary judgment case. It was a case that was decided on the summary judgment standard. It was also much different. The court in MedImmune needed to take action on a priority determination that had been taken by the Board of Patent Appeals. So there was judicial action that needed. And I would say that all the cases that have dealt with this issue in the context of consent decrees in reverse payment cases, and there are three. There's Nexium, the Androgel case, and the Cipro case, all decided that consent orders in the context of reverse payment cases did not create North Pennington immunity. So those are the cases that are directly on point on North Pennington. And I thank you very much. I see my time is up. Thank you, Mr. Ress. Mr. Sorensen. Yes, Your Honor. In terms of the royalties, we valued the OIG in our complaint at over $500 million explicitly. And we explained to the district court that oral argument that even if you grant that the royalty was paid, and by the way, there's no evidence, regardless of the record, that it was actually paid, but even if you grant that it was paid, at most that reduces it down to $425 million, which is still a large payment for nothing other than delay. Second, the promise of an OIG is sufficient. Wyeth wouldn't have made the promise. Teva wouldn't have demanded the promise unless it was valuable. And whether they actually would have launched, Your Honor, is irrelevant. If a brand says to a generic, I will pay you $500 million in cash if you stay off the market for a year. Generic stays off. If the brand breaches, if the generic stays off and the brand breaches, the generic may have a suit against the brand, but there's still an anti-competitive harm, even from the promise, even if it's not executed. I'm about to lose my voice. Under Pennington, there is no record, not a shred of evidence of any kind, that this district judge made any review of the anti-competitive effects of this agreement. Zero. There's no briefing. There's no oral argument. There is nothing. He signed the consent order put in front of him. He asked the FTC for its views. They wrote a letter that says, we understand no one's going to raise the anti-competitive issues, so therefore we're not going to comment. We reserve rights. The defendants did not respond by saying, wait a second, Your Honor, the FTC has not waived its rights. We're immune if they don't object. Nothing. The district judge, with all due respect, didn't respond to the FTC like, well, but I'm going to have to do my own independent review. Nothing happened. It is not like a Rule 23 class settlement, which has been referred to by the defendants. There's nothing approaching that. In terms of the royalties, I just want to make it clear, in addition to the fact that we explained that at most it's a $75 million deduction off a $500 million plus payment, we did, the direct purchasers, that is, did seek leave to amend one last time to explicitly deal with the royalties. We didn't think it was necessary. We tried. The district court denied leave to do that. Dismissed with prejudice. That's another source of error. Thank you very much, Mr. Sorensen. Mr. Checky. Thank you, Your Honor. Two quick points. Mr. Lefkowitz said that the authorized AG payments cannibalize the brand's own sale. That's not really what happens. An AG, an authorized generic, competes with the generic, in this case Teva, and he said, well, what would happen then is the prices would come down, right? When the AG is launched, when the authorized generic is launched, it competes with the generic on the market and brings the prices down. That's the idea. That's what should happen. I represent the consumers. That's what the statute is designed to accomplish. That's why an authorized generic can be launched, and that's the intent. So it doesn't cannibalize his brand sales. The second thing I would mention is the royalty discussion, I think, as Judge Fischer discussed, I think it illustrates why this is all a fact issue, either for summary judgment or for trial. It needs to be developed. We need to get all the facts. We need to present it to the trier of fact. Thank you, Judge. Thank you, Mr. Checky, and thank you to all the counsel. These are important cases, as was referenced a while ago. They're interesting cases, and we will take them under advisement. I also would ask or direct that we should prepare that transcript for the overargument and that we should provide transcripts for both oral arguments. Again, my thanks to the entire panel and all the counsel who have taken matters into their own hands.